**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| DR. CHRISTOPHER NIEBAUER, | : | CIVIL ACTION No. __2:21-cv-937__ |
|  | : |  |
| Plaintiff, | : |  |
|  | : | **ELECTRONICALLY FILED** |
| v. | : |  |
|  | : |  |
| SLIPPERY ROCK UNIVERSITY, | : |  |
|  | : |  |
| Defendant. | : | **COMPLAINT IN CIVIL ACTION** |

**COMPLAINT**

Plaintiff Dr. Christopher Niebauer, by his undersigned counsel, Marcus B. Schneider, Esquire and Steele Schneider, files this Complaint against Defendant Slippery Rock University and states the following:

**Introduction**

1.      This case arises out of Slippery Rock University's ("SRU" or "the University") campaign of retaliation launched at Dr. Christopher Niebauer almost immediately after he settled a Title VII lawsuit with the University in 2017. While the settlement terms promised to see Dr. Niebauer supported in the creation of a Cognitive Science Program after his transfer to the University's Department of Interdisciplinary Studies ("INDP"), the widespread retaliatory animus towards Dr. Niebauer, as a male who asserted his rights under Title VII, has prevailed over those written promises. As a result, Dr. Niebauer has been forced to succeed in spite of an arduous working environment, which isolated him as an unwanted member of INDP from the time of his arrival.

2.      Not satisfied by making Dr. Niebauer *feel* isolated, INDP, led by its de facto chair Cindy Lacom, took steps to formally isolate Dr. Niebauer. In a department meeting, INDP

1

purported to recast itself as the "Department of Culture and Diversity," whose goals were to consist of "inclusion and diversity." But as part of the claimed reformation, the department flaunted its own goals by expelling Dr. Niebauer because his social science-based Cognitive Science Program had no home in the politics-focused new department. Although the department was not authorized to undertake such actions, the department dean, Dr. Dan Bauer, allowed the public humiliation to occur and claimed to confirm that the University would be relegating Dr. Niebauer to a department of his own.

3.      In spite of immediate complaints of retaliation by Dr. Niebauer, SRU HR and administration ultimately ratified this improper conduct of INDP and its dean. Although the department, in reality, never changed—in name or mission—and although it had no authority to expel Dr. Niebauer as a faculty member, SRU administration confirmed INDP's message of opprobrium: the administration cast Dr. Niebauer into the Department of Cognitive Science and Leadership, a "department of one," where Dr. Niebauer has had to toil with little to no support from full-time peers and the University.

4.      Since this expulsion, Dr. Niebauer's battle with a retaliatory hostile environment has continued. He now asserts these claims to vindicate his Title VII and PHRA rights and force SRU to abide by the terms of settlement it claimed to agree to in good faith in 2017.

## Jurisdiction and Venue

5.      This action arises in part under 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C.A. § 1981a ("Title VII"), the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq.*, and Pennsylvania contract law.

6.      Jurisdiction over Plaintiff's Title VII claim is conferred on the Court by 28 U.S.C. §§ 1331 and 1343.

7.     Jurisdiction over Plaintiff's related state law claims is conferred on the Court by 28 U.S.C. § 1367.

8.     Venue in this District is proper under 28 U.S.C. § 1391(b).

**Parties**

9.     Plaintiff Dr. Christopher Niebauer is a Pennsylvania resident residing at 127 Jenny Dr., Butler, PA 16001.

10.     Dr. Niebauer possesses a Ph.D. in cognitive neuropsychology.

11.     Dr. Niebauer is currently an associate professor of Psychology/Cognitive Science at SRU.

12.     Dr. Niebauer is an accomplished author, especially in comparison to his former peers in SRU's Department of Interdisciplinary Studies.

13.     He has published two books, including the international best seller *No Self No Problem – How Neuropsychology is Catching up to Buddhism*, which has been published in several languages since its original publication on September 3, 2019. Dr. Niebauer's third book is expected to be published Spring 2022.

14.     Dr. Niebauer's books are dedicated to using scientific research in mindfulness and mediation to help individuals manage anxiety and depression.

15.     Defendant SRU is a public university within the Pennsylvania State System of Higher Education. SRU has a primary address for the purposes of service at 1 Morrow Way, Slippery Rock, PA 16057.

**Exhaustion of Administrative Remedies**

16.     On or about June 2, 2020, Dr. Niebauer filed a charge of discrimination alleging retaliation with the Pittsburgh branch of the Equal Employment Opportunity Commission

(EEOC), dual filed with the Pennsylvania Human Relations Commission (PHRC).

17.    On April 21, 2021, the EEOC issued a Notice of Right to Sue to Dr. Niebauer.

18.    Dr. Niebauer now timely files this Complaint.

**Factual Background**

### I.    Dr. Niebauer sues SRU under Title VII in 2014.

19.    On August 28, 2014, Dr. Niebauer filed suit in this District Court against SRU, alleging claims arising under Title VII of the Civil Rights Act, 42 U.S.C.A. §2000e-3, which was docketed at No. 14-1158 (the "Psychology Department Lawsuit").

20.    In the Psychology Department Lawsuit, Dr. Niebauer alleged, among other things, that SRU created a sexually-hostile work environment, harassed Dr. Niebauer, took adverse action against Dr. Niebauer, and denied Dr. Niebauer employment opportunities on the basis of his sex. At the time, Dr. Niebauer was the single male in SRU's otherwise entirely-female Psychology Department.

21.    Dr. Niebauer's lawsuit included allegations against SRU's Human Resources Department ("HR"), to which Dr. Niebauer had raised concerns over a period of years and from which Dr. Niebauer received no meaningful assistance.

22.    In addition to his allegations of discrimination, Dr. Niebauer alleged that SRU retaliated against him for his raising of concerns about the sex-based disparities in treatment occurring within the Psychology Department.

23.    Dr. Niebauer pursued his claims against SRU by completing discovery and by preparing for trial by complying with this Court's Local/Chambers Rules and orders governing the scheduling of pre-trial matters.

24.    Dr. Niebauer's case was scheduled to be tried in front of a jury on January 10,

2017.

**II.   SRU settles Dr. Niebauer's Title VII claims.**

25.     On January 6, 2017, Dr. Niebauer and SRU agreed to settle Dr. Niebauer's claims in the context of a settlement conference held before the Honorable Magistrate Judge Lisa Pupo Lenihan.

26.     The terms of the settlement agreement entered into by the parties were recorded before. Judge Lenihan.

27.     Among other terms discussed before Judge Lenihan, the parties agreed that Dr. Niebauer would be paid a lump sum, would be given a new, equivalent office, and would be transferred to the Department of Interdisciplinary Studies (INDP) to develop a Cognitive Science Program beginning in the Spring 2017 semester—which SRU agreed to support both in its creation and continued success.

**III.   SRU immediately fails to comply with the terms of settlement and delays written confirmation of the terms.**

28.     While former SRU Provost Philip Way (Dr. Way) superficially attempted to support the implementation of the January 7, 2017 settlement, others within the University were less supportive and frustrated Dr. Niebauer's efficient transfer to INDP.

29.     Despite the January 7, 2017 agreement that Dr. Niebauer would be moved to INDP, faculty within INDP prevailed upon Dr. Way to force Dr. Niebauer to interview before the entire INDP so that the department could vote on whether to accept Niebauer into the department.

30.     Pursuant to the terms of the settlement, SRU agreed that Dr. Niebauer would teach psychology classes during the Spring 2017 semester, at which time he would begin

developing Cognitive Science courses that he could start teaching in the Fall 2018 semester.[1]

31.    Despite this term of the agreement recited before Judge Lenihan, Dr. Niebauer was told that the SRU Psychology Department—the very same department Dr. Niebauer had alleged improper conduct against in the context of his lawsuit—would be given an opportunity to vote on whether to permit Dr. Niebauer to teach psychology classes as a member of the INDP Department.

32.    In the weeks after the settlement was reached, Dr. Niebauer made several requests to Dr. Jerry Chmielewski, the Dean of the SRU College of Liberal Arts, and Dr. Way seeking information regarding the location of his new office and assistance with moving offices.

33.    In spite of the fact that the settlement terms specifically called for this office move—out of the Psychology Department he had made accusations against in the lawsuit—as of January 19, 2017, two days before Spring 2017 classes were set to begin, Dr. Niebauer had received no information from Dr. Chmielewski or Dr. Way.

34.    Ultimately, Dr. Niebauer's office was moved to his own lab space on the first day of Spring 2017 semester.

35.    During this same time period following the Psychology Department Lawsuit settlement, Dr. Niebauer also raised concerns about his ability to develop new classes to be taught in the Fall 2017 semester because of his delayed transfer to INDP.

36.    On January 19, 2017, Dr. Niebauer was informed by the chair of INDP that the review of his move to the department would take at least a month and that he would be required to meet with each member of INDP and then be observed during a lecture before the department

---

[1]    Pursuant to the terms of the agreement on record before Judge Lenihan, Niebauer was to teach one (1) INDP class in Fall 2017, two (2) in Spring 2018, and all classes in INDP by Fall 2018.

could vote on his status.

37.     As a result of Dr. Niebauer's personal efforts and those of his counsel to move forward with his transition to INDP, Dr. Niebauer was finally scheduled for an interview before INDP faculty on February 20, 2017—a month into the Spring 2017 semester.

38.     In the meantime, the chair of INDP informed Dr. Niebauer that he would be expected to teach INDP courses as a member of the department, something that had not been discussed at the time of settlement.

39.     Dr. Niebauer interviewed with INDP on February 28, 2017.

40.     On March 6, 2017, Dr. Niebauer was informed by the chair of INDP that the department wanted to meet with SRU's Provost, Dr. Philip Way, to ask questions of him.

41.     Unbeknownst to Dr. Niebauer at the time, several of the professors in INDP—spearheaded by Dr. Cindy Lacom—sent an email to the INDP chair voicing concerns about voting to approve Dr. Niebauer's transfer into INDP.

42.     At the time, Dr. Lacom maintained close personal and professional relationships with the faculty in the Psychology Department, against whom Niebauer had made specific allegations of gender discrimination.

43.     Ultimately, Dr. Way pushed INDP's chair, Dr. Armand Policicchio, to move forward with the transfer and avoid the faculty-requested sit-down with him.

44.     As a result of these efforts, Dr. Policicchio forced the department to vote on Dr. Niebauer's transfer.

45.     On March 7, 2017, Dr. Niebauer was informed he had been voted into INDP.

46.     Dr. Niebauer later came to learn that Dr. Lacom voted against Dr. Niebauer joining the department because of his initiation of and participation in the Psychology

Department Lawsuit and attempted to persuade others to do the same.

47.    Although SRU was aware of Dr. Lacom's vocal opposition, it did not communicate these sentiments to Dr. Niebauer, nor did the University seek to discuss a reevaluation of the terms of settlement in light of the dissent within INDP.

48.    On March 30, 2017, Dr. Niebauer was informed that the Psychology Department had voted to release him to INDP.

49.    Around the same time, Dr. Niebauer expressed concerns about his ability to develop new courses at the rate envisioned in the settlement agreed upon on January 7, 2017.

50.    In response, Dr. Way informed Dr. Niebauer that his concerns could be accommodated by pushing back the start of Dr. Niebauer's transition, in terms of course subject matter, by one semester to allow for more time.

51.    In addition, in response to Dr. Niebauer's concerns regarding his ability to prepare the Cognitive Science courses within the timeframe initially envisioned, on April 3, 2017 Dr. Way stated to Dr. Niebauer in an email: "We want this to work as much as you. I understand that the concentration may not be up and running until the middle of next year, and we will give it at least a few years to flourish."

52.    Following extensive discussion designed to memorialize the original settlement terms agreed upon by the parties and contemplate the events that transpired after settlement was reached but before a settlement agreement was prepared, the parties finally prepared and entered into a written settlement agreement on or around June 27, 2017.

53.    The Settlement Agreement specifically provided that Dr. Niebauer was being transferred to INDP for the purpose of developing a Cognitive Science program for SRU.

54.    The Settlement Agreement provided that Dr. Niebauer would not have to begin

teaching INDP classes until Spring 2018. At that time, Dr. Niebauer would be responsible for teaching one INDP class; in the Fall 2018 semester, he would be required to teach two INDP classes; and in Spring 2019, he would be required to teach all of his classes in INDP.

55.     Although Dr. Niebauer had been moved from his office to his lab space for the duration of the Spring 2018 semester, the Settlement Agreement provided that Dr. Niebauer would be provided with an office outside of the Psychology Department that was qualitatively similar to the office Dr. Niebauer had while in the department.

56.     The Settlement Agreement also provided that Dr. Niebauer would not be retaliated against as a consequence of settling his Title VII claims.

**IV.     SRU engages in a pattern of retaliatory conduct against Dr. Niebauer that culminated in his eventually expulsion from INDP.**

57.     Despite Dr. Way's willingness to implement the terms of the Settlement Agreement, others at SRU interfered with and stifled Dr. Niebauer's ability to work as contemplated by the January 7, 2017 settlement and the June 2017 Settlement Agreement.

58.     Following the execution of the Settlement Agreement, Dr. Niebauer did not receive payment as was due pursuant to the terms of the Settlement Agreement (*and the January 7, 2017 settlement terms recorded before Judge Lenihan*) until September 8, 2017.

59.     In conjunction with that payment, upon information and belief, SRU filed improper tax reporting paperwork with the IRS on the payment made to Dr. Niebauer, which resulted in Dr. Niebauer having to make several appeals of an IRS decision that would have required him to pay taxes not envisioned by the terms of the Settlement Agreement (or the January 7, 2017 settlement).

60.     During the Fall 2017 and Spring 2018 semesters, Dr. Niebauer worked to develop the courses within the Cognitive Science Program he was to create under the terms of the

Settlement Agreement.

61.     While Dr. Way was generally supportive of Dr. Niebauer's efforts, beginning in the summer of 2018, prior to the start of the Fall 2018 semester—when Dr. Niebauer was to officially start the Cognitive Science Program and courses he developed—the College of Liberal Arts and INDP began to interfere with Dr. Niebauer's efforts.

62.     In the summer of 2018, the new Dean of the College of Liberal Arts, Dr. Dan Bauer, attempted to move Dr. Niebauer's office to a small room with no windows.

63.     Dr. Niebauer was forced to cite the terms of the Settlement Agreement to his Dean and avoided being moved to a substandard office.

64.     In late June 2018, Dr. Bauer attempted to force Dr. Niebauer to teach a leadership course for which Dr. Niebauer had no training. While at the time Dr. Bauer argued any professor could teach in leadership, subsequent events, including job postings specifically for a leadership professor, demonstrate that unique experience in leadership is required to teach leadership classes at SRU.

65.     To support his attempts to force Dr. Niebauer to teach the leadership course, Dr. Bauer cited low enrollment in Dr. Niebauer's Cognitive Science courses.

66.     This endeavor was at odds with the terms of settlement, SRU's good faith obligations under those terms, and the statements of Dr. Way that Dr. Niebauer would be supported in creating the Cognitive Science Program.

67.     Requiring Dr. Niebauer to teach the leadership course in lieu of a research course would have violated the terms of the collective bargaining agreement between SRU and professors because it would have required him to teach four courses.

68.     In addition, requiring Dr. Niebauer to teach a course for which he had no training

10

would have taken away from Dr. Niebauer's ability to continue to develop his Cognitive Science Program.

69.     After Dr. Niebauer again cited the terms of the Settlement Agreement and the need for an opportunity to develop the Cognitive Science Program without interference and with the support of SRU as envisioned by the Settlement Agreement, Dr. Bauer withdrew his attempt to force Dr. Niebauer to teach the leadership course.

70.     Although Dr. Niebauer succeeded in preventing this, soon thereafter, Dr. Bauer began to change schedules in a manner that made it difficult for Dr. Niebauer and the then-Leadership professor, Dr. Joe Alessi, to effectively plan for and deliver cognitive science and leadership courses.

71.     In addition to having to overcome obstacles created by SRU's interference with the efficient implementation of the terms of settlement, Dr. Niebauer had to deal with a general lack of support with respect to simple items such as creating a university website relating to the Cognitive Science Program.

72.     Moreover, the promised transition to INDP was fraught with difficulty due to the general state of disarray in the department and Dr. Lacom's negative animus towards Dr. Niebauer in connection with the Psychology Department Lawsuit.

73.     Upon information and belief, as a result of Dr. Lacom's animus towards Dr. Niebauer, she attempted to influence other INDP faculty members to negatively view Dr. Niebauer as a conservative white male who had misused the protections of Title VII in the Psychology Department Lawsuit to force his way into INDP.

74.     As a result of these efforts, few faculty members interacted with or attempted to get to know Dr. Niebauer after his transfer. Dr. Alessi and Dr. Policicchio were the only faculty

to interact with Dr. Niebauer professionally.

75.    Dr. Joe Alessi is a disabled veteran who is 53 years of age. He was hired by SRU in both a part-time and temporary full-time capacity starting in 2012 with the ROTC and in 2014 as a civilian.

76.    Dr. Niebauer and Dr. Alessi worked closely together as the University forced Dr. Niebauer's Cognitive Science Program and Dr. Alessi's Leadership courses into a similar track for students.

77.    As a result of this, Dr. Alessi came to be known as a friend and supporter of Dr. Niebauer within INDP.

78.    Dr. Policicchio, as chair of the department, was able to thwart some of Dr. Lacom's influence while he remained chair of INDP during the 2017-2018 academic year, but he retired after the Spring 2018 semester.

79.    After Dr. Policicchio's retirement, Dr. Lacom's influence became stronger and extended to Dr. Bauer, dean of INDP and Dr. Niebauer's direct superior, who ultimately came to treat Dr. Lacom as the de facto chair of INDP.

80.    As a result of Dr. Lacom's toxic view of Dr. Niebauer and her influence within INDP, fellow INDP faculty members Dr. Aksel Classon and Dr. Richelle Dykstra-Crookshanks came to either adopt Dr. Lacom's view of Dr. Niebauer or, at a minimum, acquiesce and join Dr. Lacom in her efforts to retaliate against Dr. Niebauer based upon these feelings.

81.    During the 2018-2019 academic year, as a result of the acrimony and disorganization within INDP, the faculty and Dr. Bauer discussed a variety of potential reorganizations within the department, all of which threatened to upend the terms of settlement, that  envisioned Dr. Niebauer remaining within INDP to create the Cognitive Science Program.

82.     In October 2018, Dr. Lacom complained to Dr. Bauer and the SRU president that Dr. Niebauer had expressed hostility towards SRU's diversity and gender studies courses or programs (of which Dr. Lacom is a significant contributor) to potential students.

83.     Dr. Lacom's concerns tracked her view of Dr. Niebauer as a conservative white male who is hostile towards women and minorities.

84.     By this point in time and with the retirement of Dr. Policicchio, Dr. Lacom had become the de facto chair of INDP, even though formally Dr. Ahmad Khalil was the department chair.

85.     As director of SRU's Gender Studies Program, Dr. Lacom was given additional authority by Dr. Bauer. In particular, Dr. Lacom was invited to participate in department chair meetings, she was given voting power in certain situations, and she was invited to engage in frequent one-on-ones with Dr. Bauer.

86.     During that same academic year, a wide-ranging investigation of INDP was initiated by SRU HR ("the INDP Investigation") and SRU's Title IX investigators.

87.     The INDP investigation was initiated because of an accusation that Dr. Alessi behaved violently or posed a threat of violence to other members of the department.

88.     Upon information and belief, Dr. Lacom, Dr. Dykstra-Crookshanks, and Dr. Classon brought the concerns that led to this investigation and targeted Dr. Alessi because he is a white male.

89.     Dr. Niebauer participated as a witness in this investigation and testified favorably on behalf of Dr. Alessi.

90.     In an interview during that investigation, Dr. Niebauer came to learn that a faculty member had also accused Dr. Niebauer of behaving violently by slamming his fists down on a

desk during an INDP meeting. Upon information and belief, these allegations were made by Dr. Lacom.

91.     At this time, Dr. Niebauer raised concerns within SRU regarding his belief that Dr. Lacom harbored animus against him regarding the settlement of his Title VII claims and his transition into INDP as a result of that settlement.

92.     This animus had been apparent throughout the 2018-2019 school year, during which time Dr. Niebauer was made to feel like an outsider in INDP and had his contributions downplayed and marginalized by other members of the department.

93.     Similarly, Dr. Lacom's animus towards Dr. Alessi and anti-white male sentiments were also obvious during this time.

94.     During a hiring process, Dr. Lacom, as chair of a review committee, gave a significant advantage to the female under review and created various obstacles in order to disadvantage the two white males under review.

95.     In addition, during the INDP Investigation, Dr. Lacom, Dr. Niebauer, and others were responsible for reviewing Dr. Alessi's performance.

96.     At the time, Dr. Alessi was a temporary faculty member, but he had been with SRU in the capacity of leadership professor for years. Dr. Niebauer had discussed with Dr. Bauer and Dr. Way the prospect of hiring Dr. Alessi to a tenured position as part of contemplated reorganizations of INDP. Upon information and belief, Dr. Way had similar discussions with Dr. Alessi directly.

97.     Although Dr. Alessi's excellent job performance had been well-documented and known for years leading up to the 2018-2019 academic year, Dr. Lacom questioned aspects of Dr. Alessi's performance despite his strong job performance record.

14

98.     Beyond questioning Dr. Alessi's performance, Dr. Lacom scheduled a meeting for Dr. Alessi to respond to Dr. Lacom's bogus claims of concern regarding job performance, and she invited Dr. Bauer and a union rep to the meeting.

99.     As a participant in this meeting, Dr. Niebauer invited HR to attend because of his concerns regarding Dr. Lacom's intentions and her efforts to involve the Dean and a union representative, but HR declined to attend, citing the ongoing INDP Investigation as a reason for having to stay uninvolved.

100.     Dr. Alessi attended the meeting and ultimately met the challenges raised by Dr. Lacom.

101.     In spite of this, INDP voted not to retain Dr. Alessi in the department for the 2019-2020 school year.

102.     After removing Dr. Alessi from the equation, Dr. Lacom and her supporters, including Dr. Bauer, turned their attention to Dr. Niebauer.

103.     With Dr. Policicchio retired and Dr. Alessi not a part of the INDP's future, no one remained to prevent retaliation by those opposed to Dr. Niebauer.

104.     Against this backdrop, the retaliatory agenda of Dr. Lacom and Dr. Bauer culminated in INDP's impermissible expulsion of Dr. Niebauer, which SRU administration ultimately ratified and effectuated just before the start of classes in the Fall 2019 semester.

**V.     INDP exceeds its authority and expels Niebauer during a department meeting.**

105.     On May 15, 2019, INDP held its spring department meeting, and Dr. Bauer, as dean of the department, was in attendance.

106.     Dr. Niebauer informed the INDP chair, Dr. Ahmad Khalili, that he would be late to the spring meeting due to a surgical procedure his daughter had to have performed.

107.   Dr. Niebauer arrived at the meeting 45 minutes after it had begun.

108.   When Dr. Niebauer arrived to the meeting, he observed that the department was engaged largely in small talk.

109.   Dr. Niebauer joined into the discussion and began to discuss the predominantly liberal makeup of faculty on campus with Dr. Casson.

110.   Dr. Bauer interjected and expressed his opinion that there should be no conservatives on campus and those that are present should be run off campus.

111.   Dr. Niebauer also observed a large overhead identifying a new department with the "Department of Culture and Diversity" title.

112.   The display showed the new goals of the department, which were political and not social scientific, and included, among other things, "inclusion," "diversity," and "equity."

113.   Soon after Dr. Bauer's comment, Dr. Lacom began to run a more formal meeting, another indication of her role as de facto chair of INDP at the time.

114.   Dr. Lacom revealed to Dr. Niebauer that the Interdisciplinary Studies label for the department had been shed in favor of the reformed "Department of Culture and Diversity."

115.   After unveiling the new department, Dr. Lacom asked Dr. Niebauer, "How does Cognitive Science fit into this new department?"

116.   Dr. Niebauer indicated that his Cognitive Science program, a social science program, did not fit within the politically-oriented "Department of Culture and Diversity," as described by the goals listed on the display.

117.   At that point, Dr. Classon, asked Dr. Niebauer to leave the meeting, but Dr. Niebauer refused.

118.   In response to Dr. Niebauer's refusal, Dr. Bauer indicated that Dr. Niebauer's lack

16

of fit with the purported Department of Culture and Diversity did not matter because Dr. Bauer

had discussed the matter with Dr. Way and, per that discussion, Dr. Niebauer would be removed

from INDP and placed into his own department of one.

119.    Considering Dr. Niebauer had already been asked to leave, Dr. Niebauer left the

INDP meeting after Dr. Bauer's statements, and the department advocated "inclusion, diversity,

and equity" had succeeded in expelling its unwanted member from its meeting.

**VI.    SRU keeps Niebauer in the dark regarding its plans for him and Dr. Alessi.**

120.    Dr. Niebauer immediately wrote to Dr. Way regarding the situation.

121.    Dr. Way discussed with Dr. Niebauer the possibility of Dr. Niebauer becoming

chair of a Cognitive Science and Leadership Department that would include Dr. Alessi.

122.    Dr. Way attempted to reassure to Dr. Niebauer that everything would be fine.

However, Dr. Way left the University for another position only weeks later and, upon

information and belief, may have known of his impending departure at the time of his discussion

with Dr. Neibauer regarding the May 15, 2019 INDP meeting.

123.    Dr. Niebauer also expressed questions concerns to Dr. Bauer regarding the actions

that occurred in the departmental meeting.

124.    Dr. Bauer provided few answers to Dr. Niebauer's questions, and created more

uncertainty and doubt by stating that all plans were up in the air after Dr. Way's departure.

125.    On May 21, 2019, Dr. Niebauer sent an email to HR asking whether INDP had

the power to kick him out of the department.

126.    Dr. Niebauer expressed his belief that neither INDP through its faculty nor INDP

in conjunction with its dean, Dr. Bauer, had the authority to unilaterally kick Dr. Niebauer out of

INDP.

127.   In fact, this conduct is impermissible and was a violation of the applicable collective bargaining agreement and SRU's own code of conduct and is in direct opposition to the University goals of diversity, equity, and inclusion.

128.   In addition, Dr. Niebauer expressly stated to HR that he believed the actions of INDP and Dr. Bauer were retaliatory, whether stemming from Dr. Niebauer's initiation of and participation in the Psychology Department Lawsuit or Dr. Niebauer's supporting Dr. Alessi in the INDP investigation.

129.   As it had failed to do throughout Niebauer's history of raising concerns and formal complaints with HR prior to the Psychology Department Lawsuit, HR never meaningfully responded to Niebauer in regard to INDP's and Dr. Bauer's May 15, 2019 actions.

130.   In addition, although Dr. Niebauer raised his express concerns of retaliation at a time when HR was in the midst of conducting a wide-ranging investigation of INDP, which had still not been finalized with findings, HR never made the actions of May 15, 2019 a part of its investigation, and upon information and belief, it did not address the same in its investigative report.

131.   After Dr. Way left the University, Dr. Chmielewski, who was the Dean of the College of Liberal Arts at the time of Dr. Niebauer's settlement, assumed the role of Interim Provost.

132.   Throughout the summer of 2019, Dr. Niebauer was left without clarity as to his status.

133.   Specifically, Dr. Niebauer was never told whether Dr. Way's discussion of a potential Cognitive Science and Leadership Department that would include Dr. Alessi would go forward or if he would remain a department of one with no connection to another program or

even part time temporary faculty.

134.    Dr. Alessi was also left in the dark by SRU as to its plans for the Fall 2019

semester, although he did expect to receive an offer from the University based upon Dr. Way's

statements and what information he was able to gather.

**VII.    SRU appoints Dr. Niebauer to a department of one and does not offer Dr. Alessi
         employment.**

135.    On August 14, 2019, Dr. Niebauer again sent an email to HR reiterating his belief

that his forced exit from INDP was retaliatory and improper.

136.    On August 15, 2020, Dr. Niebauer was told for the first time that INDP had not

been reorganized or reshaped as a different department; it still maintained the INDP name.

137.    Dr. Niebauer was further informed that there had been no administration-level

approval of the creation of a new or modified INDP.

138.    Yet the University proceeded as if Dr. Niebauer was not a part of INDP.

139.    An "emergency mandatory meeting" was scheduled for August 23, 2019, and Dr.

Niebauer was invited to attend.

140.    Present at the meeting were Dr. Niebauer, Dr. Bauer, Dr. Chmielewski, three

faculty from INDP (including Dr. Lacom and Dr. Dykstra-Crookshanks), and president of the

professors' union, Ben Shaevitz.

141.    At the meeting, Dr. Chmielewski, as acting Provost for SRU, made clear that Dr.

Niebauer would no longer be part of INDP, even though, Dr. Chmielewski made clear, INDP

had never been reformed into the "Department of Culture and Diversity."

142.    Upon learning that the department remained the same, Dr. Niebauer looked to his

INDP peers for an explanation as to their treatment of him at the May 15, 2019 meeting

143.    His peers could provide no answer: Dr. Dykstra-Crookshanks merely persisted in

the false claim that the faculty did what it did "because it had to," even in the face of Dr. Chmielewski's confirmation that INDP remained intact.

144.    Dr. Dykstra-Crookshanks has never provided a more substantive response to Dr. Niebauer, despite Dr. Niebauer's requests for an explanation, indicating that Dr. Dykstra-Crookshanks merely joined in the retaliatory actions of Dr. Lacom and Dr. Bauer.

145.    Instead of disciplining those involved in the actions of May 15, 2019 and making clear that Dr. Niebauer remained in INDP—as was required by the terms of settlement from the Psychology Department Lawsuit—Dr. Chmielewski informed Dr. Niebauer that he would be a department of one (full time permanent faculty) under the heading of the Cognitive Science and Leadership Department.

146.    But contrary to the plan Dr. Way had outlined, Dr. Alessi did not join Dr. Niebauer in this department; SRU had never even offered Dr. Alessi a contract during the summer, which forced Dr. Alessi to find other employment.

147.    Ultimately, after Dr. Alessi initiated EEOC claims against SRU, the University provided a substandard contract offer a mere two business days before classes were set to begin.

148.    As a result of its actions, Dr. Alessi initiated EEOC claims against SRU, which he has since settled.

**VIII.   Dr. Niebauer becomes the chair of a department of one, taking on a significant array of obligations never envisioned by his prior settlement with SRU.**

149.    As the only full time member of the Cognitive Science and Leadership Department, Dr. Niebauer was forced to become chair of the department.

150.    As chair, Dr. Niebauer assumed many new obligations, which he was forced to undertake while attempting to continue his development of the Cognitive Science program he initially began after settling his prior Title VII lawsuit.

151.    Included among these added obligations, Dr. Niebauer was forced to singlehandedly oversee and advise more than 30 majors and nearly 200 minors, which required one-on-one interaction with these students.

152.    Had Dr. Niebauer remained a member of INDP, these obligations would not have fallen to him alone.

153.    Had SRU not effectively terminated Dr. Alessi, Dr. Niebauer would have had assistance in performing this obligation. In particular Dr. Alessi, as advisor for the leadership program, had dozens of students preparing for graduation, all of which required special attention within a program Dr. Niebauer was never trained for and knew very little about. Many of these students required special and unique waivers due to the complex and changing nature of the leadership program.

154.    In addition, Dr. Niebauer was forced to hire another faculty for the position vacated as a result of SRU's separation with Dr. Alessi. The search to fill Dr. Alessi's position was forced on Dr. Niebauer only days before classes began in the 2019-202 academic year.

155.    This involved Dr. Niebauer contacting numerous individuals in an effort to find a replacement professor. As classes had just started, it was almost impossible to find a qualified instructor that was not already committed to another contract.

156.    Eventually, SRU eliminated a class for this professor position, which led to the hiring of a part-time professor who was unable to assist Dr. Niebauer in his departmental obligations due to his part-time status. In addition, because the part-time hire was unfamiliar with SRU, Dr. Niebauer was forced to mentor him during the Fall 2019 semester.

157.    SRU gave Dr. Niebauer no explanation outside of expense for the hiring of part-time instructors rather than the simpler hiring of one full-time instructor, which would have been

far less demanding on Dr. Niebauer.

158.    After working tirelessly during the Fall 2019 semester in an effort to overcome these difficulties, Dr. Niebauer raised concerns regarding his situation with HR during the winter break.

159.    On January 2, 2020 and January 7, 2020, Dr. Niebauer sent emails requesting a meeting and reiterating that he felt Dr. Chmielewski's and Dr. Bauer's placement of Dr. Niebauer in a department of one was retaliation for Dr. Niebauer's prior Title VII lawsuit, the subsequent settlement, and/or his participation in the investigation into Dr. Alessi.

160.    Dr. Niebauer met with a union representative and HR on January 20, 2020, and the SRU Human Resources representative dismissed Dr. Niebauer's concerns over administration's adoption of INDP's expulsion of him from that department; SRU's head of HR Lynne Motyl explicitly told Dr. Niebauer she was not concerned with the past but only with what was happening right at that time.

161.    Dr. Niebauer remains the sole full-time faculty member in the Cognitive Science and Leadership Department, and he continues to be burdened with developing an entire department without any full-time professor to assist less than two years after he began developing the program—obligations not even remotely envisioned in Dr. Niebauer's prior settlement with SRU.

162.    As a department of one, Dr. Niebauer is at great risk for retrenchment, something that he would not face as a member of a larger department like INDP (the second largest department at SRU), which he was slated to be a member of until given an opportunity to develop the Cognitive Science Program pursuant to the terms of the settlement and Settlement Agreement.

**IX.     Retaliation against Dr. Niebauer as chair of a department of one continues at present.**

163.    When Dr. Niebauer was told that he would become the chair of a department of one, he was told that the chair position was covered by a three-year contract.

164.    As chair, Dr. Niebauer was due an additional payment of approximately $5,000 for the performance of his chair duties throughout the 2019-2020 academic year.

165.    Dr. Niebauer was due this payment on May 22, 2020, but he was not paid despite performing all chair obligations.

166.    Dr. Bauer claimed to Dr. Niebauer that he was not paid because he was not in fact chair during Spring 2020—despite the fact that he performed each and every chair duty—due to not "checking a box" on a form regarding his reelection as chair in December 2019.

167.    Effectively, Dr. Bauer's position was that, as chair, Dr. Niebauer was required to elect himself as chair.

168.    While Dr. Niebauer never wanted to be department chair (and assuming a chair role was not envisioned by the 2017 settlement), he was forced to become chair because he was the only full-time member of the department he was forced into by Drs. Bauer and Chmeliewski.

169.    Dr. Bauer's position that Dr. Niebauer was not paid because he failed to complete a form is nonsensical inasmuch as (1) Dr. Niebauer performed the role of chair in a department within Dr. Bauer's purview for more than 5 months; (2) Dr. Niebauer is a department of one, so the entire notion of his election as chair is foolish; and (3) Dr. Niebauer had never been chair (and never wanted to be chair) prior to the 2019-2020 academic year and was not counseled or mentored on performing the chair function, let alone on what he needed to do to extend his status as chair to the next academic year.

170.    When Dr. Niebauer raised these concerns, Dr. Bauer refused to discuss the matter

23

any further with Dr. Niebauer.

171.    While Dr. Niebauer ultimately received this payment, as the only department of one on campus and the only professor to be in his third different department and second college at SRU, Dr. Niebauer is subjected to ostracism by his colleagues as a "department of one."

172.    In that capacity, Dr. Niebauer is effectively expected to hold monthly meetings by himself and with no colleagues.

173.    Moreover, in his professional capacity as a cognitive psychologist, Dr. Niebauer must compete with others that are in cooperative departments with a diverse groups of individuals who provide the sort of support, help, and diverse views that Dr. Niebauer does not have access to given his current position with SRU.

174.    To date, SRU has been unable to identify anything Dr. Niebauer has done to warrant his being in this situation.

175.    To the contrary, SRU's most recent one-year and five-year evaluations of Dr. Niebauer have been entirely positive.

**X.     SRU abandons efforts to resolve Dr. Niebauer's concerns of retaliation based upon his advocacy for viewpoint diversity on campus.**

176.    Despite receiving little support or assistance from SRU administration and HR regarding his many complaints of retaliation, Dr. Niebauer engaged in extensive efforts to resolve the foregoing disputes with the University before filing the instant complaint.

177.    In particular, Dr. Niebauer engaged in numerous conversations with Dr. Abbey Zink, SRU's current provost who was mentored by Dr. Chmielewski before formally stepping into the role.

178.    Among other things, Dr. Niebauer discussed and considered the apparent tentative plan (settled upon without Dr. Niebauer's involvement) that Dr. Niebauer would be moved to

SRU's College of Business, as well as the potential of being moved to SRU's anticipated College of Health Professionals (either after a brief stay in the College of Business or directly from his current situation as a department of one).

179.    As part of Dr. Niebauer's ongoing efforts to discuss resolution in a manner that would ensure that any settled-upon terms would be respected and not violated by the University, Dr. Niebauer informed Dr. Zink that he has ongoing concerns regarding viewpoint diversity on

campus and offered to help form a commission to help reestablish viewpoint diversity on SRU's campus.

180.    After conveying this message, SRU ended settlement discussions with Dr. Niebauer and suggested that he could take his views to a different university.

**Count I: Retaliation**
**Title VII of the Civil Rights Act of 1964 and Pennsylvania Human Relations Act**

181.    The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

182.    Dr. Niebauer engaged in protected activity under both Title VII and the PHRA by litigating and settling the Psychology Department Lawsuit.

183.    Dr. Niebauer engaged in protected activity under both Title VII and the PHRA by participating in the INDP Investigation and providing testimony in support of Dr. Joe Alessi.

184.    Dr. Niebauer engaged in protected activity by raising concerns and complaints of retaliation to SRU administration both before and after the May 15, 2019 INDP and the August 23, 2019 SRU administration meetings.

185.    Following his settlement of the Psychology Department Lawsuit, Dr. Niebauer was targeted for retaliation by INDP faculty, Dean Bauer, and various members of SRU administration and HR as set forth in this Complaint.

186.    In particular, INDP, led by Dr. Lacom and with the support of Dr. Bauer, kicked Dr. Niebauer out of the INDP in the May 15, 2019 under false pretenses.

187.    SRU HR failed to address this conduct either directly or in the context of its ongoing investigation into INDP, in spite of express complaints of retaliation by Dr. Niebauer.

188.    Moreover, in spite of the improper conduct of INDP and Dr. Bauer on May 19, 2019 and Dr. Niebauer's complaints of retaliation to SRU administration and HR, SRU

administration removed Dr. Niebauer from INDP and placed him into the Department of

Cognitive Science and Leadership as the only full-time faculty member in the department,

ratifying and giving effect to INDP's improper expulsion of Dr. Niebauer.

189.    Moreover, SRU administration frustrated Dr. Niebauer's efforts to perform in

spite of the University's conduct by not retaining Dr. Alessi, not hiring another full-time faculty

member, and in the process, foisting significant responsibilities onto Dr. Niebauer, which

necessarily interfered with Dr. Niebauer's efforts to continue to develop his Cognitive Science

Program.

190.    Following these actions, Dr. Niebauer was targeted for retaliation by Dr. Bauer,

who attempted to force Dr. Niebauer to undertake teaching responsibilities at odds with the terms

of settlement.

191.    As a result of SRU's retaliatory actions, Dr. Niebauer suffered emotional distress,

including humiliation, mental distress, embarrassment and like conditions.

WHEREFORE, Dr. Niebauer hereby demands judgment pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991, and the

Pennsylvania Human Relations Act 34 of 1997, 43 P.S. § 1951 *et seq.*, as follows:

A.  That the Court enter a judgment declaring Defendant SRU's retaliatory actions to be
    unlawful and in violation of Title VII and the PHRA;

B.  That Dr. Niebauer be awarded compensatory damages in an amount to be determined at
    trial;

C.  That Defendant SRU be ordered to pay Dr. Niebauer punitive damages in an amount
    determined at trial;

D.  That Defendant SRU be enjoined from discriminating or retaliation against Dr. Niebauer in any manner prohibited by Title VII;

E.  That Defendant SRU be ordered to pay Dr. Niebauer's reasonable costs and expenses of litigation, including a reasonable attorneys' fee; and

F.  That Dr. Niebauer be granted such other further legal and equitable relief as the Court may deem just and proper.

## Count II: Title VII of the Civil Rights Act of 1964
## Retaliatory Hostile Environment

192.    The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

193.    Dr. Niebauer engaged in protected activity under both Title VII and the PHRA by litigating and settling the Psychology Department Lawsuit.

194.    Dr. Niebauer engaged in protected activity under both Title VII and the PHRA by participating in the INDP Investigation and providing testimony in support of Dr. Joe Alessi.

195.    Dr. Niebauer engaged in protected activity by raising concerns and complaints of retaliation to SRU administration both before and after the May 15, 2019 INDP and the August 23, 2019 SRU administration meetings.

196.    Title VII prohibits SRU, as Dr. Niebauer's employer, from creating or fostering a retaliatory hostile environment. *Hare v. Potter*, 220 Fed.Appx. 120, 132-133 (3d Cr. 2007).

197.    As detailed above, in spite of SRU's promise not to retaliation against Dr. Niebauer because of his settlement of the Psychology Department Lawsuit, SRU has created

and/or fostered a severe and pervasive hostile work environment for Dr. Niebauer from the minute Dr. Niebauer agreed to settle his prior lawsuit.

198.    SRU forced Dr. Niebauer to jump through numerous hoops, including interviewing with INDP and seeking approval of the Psychology Department to continue to teach psychology courses, which caused great professional humiliation to Dr. Niebauer.

199.    SRU went forward with placing Dr. Niebauer in INDP in bad faith and with full knowledge of Dr. Lacom's retaliatory animus.

200.    Since that time, Dr. Niebauer has been routinely ostracized and made to feel like an outsider in the department, while also facing pressure from Dr. Bauer to undertake professional obligations at odds with or inconsistent with the prior terms of settlement.

201.    Until finally, Dr. Niebauer was actually made to be an outsider through his improper expulsion at the hands of his dean, department, and eventually the University.

202.    The complete disregard of this hostile work environment by SRU HR, in spite of express complaints of retaliation by Dr. Niebauer, further cemented Dr. Niebauer's perception that the University would make him pay the price of a collegial work environment for litigating and settling his prior lawsuit.

203.    As a result of this retaliatory hostile work environment perpetuated by Dr. Niebauer's peers, superiors, and SRU HR, Dr. Niebauer suffered emotional distress, including humiliation, mental distress, embarrassment and like conditions.

WHEREFORE, Dr. Niebauer hereby demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991, and the Pennsylvania Human Relations Act 34 of 1997, 43 P.S. § 1951 *et seq.*, as follows:

A. That the Court enter a judgment declaring Defendant SRU's retaliatory actions to be unlawful and in violation of Title VII and the PHRA;

B. That Dr. Niebauer be awarded compensatory damages in an amount to be determined at trial;

C. That Defendant SRU be ordered to pay Dr. Niebauer punitive damages in an amount determined at trial;

D. That Defendant SRU be enjoined from discriminating or retaliation against Dr. Niebauer in any manner prohibited by Title VII;

E. That Defendant SRU be ordered to pay Dr. Niebauer's reasonable costs and expenses of litigation, including a reasonable attorneys' fee; and

F. That Dr. Niebauer be granted such other further legal and equitable relief as the Court may deem just and proper.

## Count III: Breach of Contract

204. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

205. Dr. Niebauer and SRU entered into a contract to settle the Psychology Department Lawsuit, namely, the "Settlement Agreement and Release of All Claims" signed by the parties and their counsel (the "Settlement Agreement").

206. The underlying claims giving rise to the Settlement Agreement were filed under Title VII, and the purpose of the agreement was to resolve the supporting allegations of discrimination and retaliation.

207. Thus, the Settlement Agreement is "'founded on' principles other than those based in contract law" and is enforceable in this Honorable Court. *Nahourii v. Indiana University*

*of Pennsylvania*, 2021 WL 954645, at \*5 (W.D. Pa. Mar. 20, 2012) (citing *Porreco v. Maleno*

*Developers, Inc.*, 717 A.2d 1089, 1094 (Pa. Commw. Ct. 1998)).

208.    Pursuant to the terms of the Settlement Agreement, Dr. Niebauer was supposed to

be moved to an office of qualitative similarity to his office in the Psychology Department.

209.    In violation of those terms, Dr. Niebauer has been given substandard office and

lab conditions, and he has been placed in offices that have furthered the ostracism stemming

from the retaliation by the University, HR, and Dr. Niebauer's peers.

210.    Pursuant to the terms of the Settlement Agreement, Dr. Niebauer was to be

transferred to INDP to develop a Cognitive Science Program, which the University would

support.

211.    Dr. Bauer attempted to violate the terms of the Settlement Agreement by trying to

force Dr. Niebauer to teach leadership courses and by criticizing the success of the program

before Dr. Niebauer has had a reasonable chance to develop it.

212.    The University breached the Settlement Agreement by removing Dr. Niebauer

from INDP and placing him into a "department of one" just over two years after the Settlement

Agreement was signed.

213.    Rather than support Dr. Niebauer in the development of a cognitive science

program, in breach of the terms of the Settlement Agreement, the University has interfered with

Dr. Niebauer's ability to develop the program by forcing him to take on additional

responsibilities and refusing to facilitate the program through the hiring of full-time faculty and

creation of a program website.

214.    Pursuant to the terms of the Settlement Agreement, SRU is prohibited from retaliating against Dr. Niebauer as a result of his participation in the Psychology Department Lawsuit and execution of the Settlement Agreement.

215.    As set forth in Counts I and II above, the University has breached this promise by retaliating against Dr. Niebauer and creating and/or fostering the creation of a retaliatory hostile work environment.

WHEREFORE, Dr. Niebauer respectfully requests this Honorable Court enters judgment in his favor as follows:

A.  That SRU be ordered to specifically perform as necessary to uphold the terms of the Settlement Agreement, including any necessary injunction prohibiting further breach of the terms;

B.  That Dr. Niebauer be awarded consequential damages in an amount to be determined at trial, including but not limited to, Dr. Niebauer's attorneys' fees and costs associated with enforcing the terms of the Settlement Agreement;

C.  That Dr. Niebauer be granted such other further legal relief as the Court may deem just and proper.

Date:   July 19, 2021

Respectfully submitted,


/s/ Marcus B. Schneider
Marcus B. Schneider, Esquire
PA I.D. No. 208421
Nicholas Pahuta, Esquire
PA I.D. No. 324355
STEELE SCHNEIDER
420 Ft. Duquesne Blvd., Suite 500
Pittsburgh, PA 15222
(412) 235-7686

(412) 235-7693/facsimile
marcschneider@steeleschneider.com
nickpahuta@steeleschneider.com

*Counsel for Plaintiff*